**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**JAMES F. DUBUQUE,**
         **Plaintiff,**

vs.                                                              Civil No. 01-0327 RLP

**JO ANNE B. BARNHART, Commissioner**
of the Social Security Administration,

         **Defendant.**

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiff's Motion to Reverse or Remand Administrative Agency Decision. (Docket No.14). Plaintiff seeks disability income and supplemental security benefits, alleging that he has been disabled since December 31, 1995, due to a seizure disorder and Post Traumatic Stress Disorder ("PTSD" herein). For the reasons stated herein Plaintiff's Motion is granted in part, and this matter is remanded to the Commissioner of Social Security for Additional Proceedings.

**I.      Background**

Plaintiff was born on April 1, 1947. (Tr. 87). He completed high school and a four-year apprenticeship as an electrician. (Tr. 98). He was previously employed as an electrician and a truck driver (Tr. 90-100), jobs that required medium exertional ability. (Tr. 59). Plaintiff developed a seizure disorder in December 1995. (Tr. 46-47). His seizures were eventually attributed to alcohol withdrawal. He was placed on Librium and advised to quit drinking. (Tr. 189-192). He suffered an additional seizure in April 1997 after fasting for 36 hours and not sleeping. (Tr. 186). Plaintiff was placed on Dilantin for seizure control in September 1997, and did not have another seizure until January 1998, when he stopped taking Dilantin as prescribed. Proper use of medications was

emphasized. (Tr. 158-159). His poor compliance with his medication regimen continued through March 1998. (Tr. 157, 154). Thereafter his seizures were well controlled on Dilantin.[1] (Tr. 149-150, 241, 48, 275).

Lance Rudolph, M.D., an internist, conducted a medical examination to evaluate Plaintiff's seizure disorder and related headaches on July 6, 1998. (Tr. 195-197, 230). Plaintiff's physical examination was entirely normal except for allergy symptoms, findings related to possible asthma[2], an old injury to Plaintiff's right foot[3] and a fungal infection of the finger and toenails. In addition, Plaintiff indicated that he had no problems in terms of mobility or carrying objects. Plaintiff's neurological examination was also normal. Dr. Rudolph reviewed Plaintiff's medical records, which documented the presence of a seizure disorder. He indicated that the seizures "would preclude him from doing any type of activity with inherent risk such as working off the ground or driving a vehicle," and that Plaintiff "might be able to do sedentary work, such as some type of desk work or computer work as long as his employer understood that he has a history of seizures which could occur at any time." (Tr. 197).

Dr. Rudolph's report was reviewed by an agency physician who stated that the report did not establish any exertional limitation and that the medical evidence established environmental limitations precluding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such

---

[1] In October-November 1998, Plaintiff complained of symptoms he associated with a seizure coming on: Anger, moodiness, tenseness and headache. He was evaluated at the VA hospital, and these symptoms were felt not to be connected with his seizure disorder. (Tr. 254-255).

[2] Plaintiff was subsequently placed on asthma medication. (See e.g., Tr. 134). He does not claim that asthma contributes to his alleged disability.

[3] Plaintiff had reconstructive surgery on his right foot approximately 12 years prior to his administrative hearing. He testified that after it had healed, the injury to his foot did not interfere with his ability to work. (Tr. 51-52).

as machinery and heights. (Tr. 212-220).

Carlos Balcazar, M.D.[4], conducted a psychiatric examination on Plaintiff on July 10, 1998. He found Plaintiff to have preserved attention span and concentration, appropriate emotional reaction, goal oriented thought processes, and a degree of impairment in remote and recent memory. (Tr. 199-200). He diagnosed Alcohol abuse in remission (Axis I), Possible atypical personality disorder (Axis II), Seizure disorder (Axis III), mild psycho social stressors over the past year (Axis IV) and a poor level of optimal function over the past year (Axis V)[5]. (Tr. 200). He concluded:

> I think this man has adequate judgement to plan a work sequence. From a psychiatric standpoint, he could use tools and materials for simple jobs, and he could perform one- or two-step repetitive tasks at a competitive rate. Based on my contact with him, I would not foresee difficulty in his interaction with coworkers and supervisory personnel.

(Tr. 200).

Dr. Balcazar's report was reviewed by an agency psychologist who concluded that Plaintiff's mental impairment was not severe. (Tr. 202-210).

Plaintiff was evaluated that the Veterans' Administration Hospital on November 1996 by a psychiatric triage clinical specialist for reported anger problems present since military service in Viet Nam. (Tr. 244-246). He reporting having only two alcoholic drinks after his seizures started, spending a lot of time with his daughter, and a good relationship with his ex-wife, however, he also related some intrusive thoughts, hypervigilence, nightmares, restless sleep and irritability. He denied suicidal or homicidal thoughts. On mental status exam he was oriented, alert, demonstrated good eye

---

[4]Dr. Balcazar is board certified in psychiatry and neurology. (Tr. 231).

[5]This rating system is used in the Diagnostic and Statistical Manual of Mental Disorders, Third Ed., (DSM-III). A rating of "poor" in Axis V indicates "Marked impairment in either social relations or occupational functioning, or moderate impairment in both." DSM-III at 29.

contact, reported an anxious mood with insomnia and some decreased concentration. His affect had "fair range, occasional appropriate smile." His insight was adequate and judgement intact. He was diagnosed as suffering from PTSD and alcohol abuse in remission (Axis I) with a global assessment of functioning of 55. He requested counseling, and indicated he didn't want to take medication.

On January 14, 1999, Plaintiff was evaluated by Annette Brooks, PhD., at the Veterans' Administration PTSD program. (Tr. 243). He reiterated that his primary problem was anger outbursts, but also described other symptoms including re-experiencing, hyper-arousal, avoidance and "occasional" suicidal thoughts without plan or intent. Dr. Brooks diagnosed severe, chronic PTSD, Intermittent Explosive Disorder secondary to PTSD and Ethanol Dependence in full remission. Plaintiff again refused medication, and was referred to an anger management group in lieu of PTSD treatment, because he was "hesitant to accept PTSD label and equally uncertain about PTSD treatment." (Tr. 243). Dr. Brooks subsequently prepared a biopsychosocial assessment. (Tr. 239-242). In this expanded note she stated:

> Pt reports anger problems as primary difficulties, at least twice a day. A few months ago, he relates good management ("I catch myself & talk to myself to calm me down"), but is currently experiencing an increase in feelings of rage. Other complaints include nightmares (frequency ranges from 1x/month to 1x/week), intrusive memories "occasionally," flashbacks (1x/month), avoidance, trouble sleeping, exaggerated startle reaction, isolation, occasional suicide thoughts & emotionally numb. Pt. reports difficulties since d/c from military, but is concerned that he be perceived as "blaming Vietnam." . . . Pt endorses occasional SI but reports that they are fleeting and has no intent. He remarks "not serious would never do that to my daughter." Pt endorses diffuse, vague homicidal thoughts when in a rage, but is able to calm himself down & it has never included plans or intent.
> \* \* \*
> Diagnostic Formulation
> Axis 1: PTSD, chronic; ETOH Abuse, in full remission
> Axis 2: differed
> Axis 3: seizure d/o
> Axis 4: Unemployed - economic hardship, living with mother, chronic illness

    Axis 5:  GAF 50[6].

(Tr. 241-242).

    On February 24, 1999, Diane Castillo, PhD, conducted a psychiatric evaluation prior to Plaintiff's enrolling in group therapy for anger management. (Tr. 233-234). Plaintiff was again asked to describe his anger problem.  She recorded " . . . that he typically raises his voice when he is angered (MODE); he is angered by minor event, such as in traffic (SITUATIONS); and he expresses his anger at those that provoke him (PEOPLE).  He denied hallucination, SI/HI, and current alcohol/drug use."(Tr. 234).  Dr. Castillo noted that Plaintiff had poor eye contact, was anxious and constricted, had clear, coherent and linear thoughts,  was fully oriented  and that his judgment and insight were fair in that he was interested in treatment.  (Id.)  She diagnosed Intermittent Explosive Disorder and PTSD (Axis I), and assigned a GAF of 53.[7]  (Id.)

    Plaintiff attended eight group therapy sessions conducted by Dr. Castillo  from  March 1 to April 26, 1999.  (Tr. 233, 271-274, 276-278).  By the final session Plaintiff reported that the sessions had been helpful, and lessened his anger from a 75 to a 40.  Testing[8] "showed improvement overall in most subcales (sic) of the Anger inventory with dramatic decreases on the Assault and Suspicion subscale and with only one subscale, Verbal Hostility staying the same."  (Tr. 271).

    On June 21, 1999, Dr. Castillo, completed  a "Medical Assessment of Ability To Do Work-

---

    [6]This rating system is used in the <u>Diagnostic and Statistical Manual of Mental Disorders,</u>  4th Ed., (DSMIV).  A rating of 50 in Axis V indicates "Serious symptoms . . . or any serious impairments in social, occupational or school functioning. . . "<u>DSM IV</u> at 32.

    [7]This GAF score is indicative of "Moderate symptoms . . or moderate difficulty in social, occupational or school functioning . . ."  <u>Id.</u>

    [8]Buss-Durkee Anger Inventory.  (Tr. 129, 271).

Related Activities (Mental)" form ("Mental Assessment Form" herein) stating that Plaintiff had a fair ability to relate to co-workers, deal with the public, interact with supervisors and deal with work stresses[9] due to an increase in stress that interfered with his ability to concentrate and interact in social situations as effectively as in the past. (Tr. 297); a fair ability to behave in an emotionally stable manner and no useful ability to relate predictably in social situations due to stress which significantly impaired his functioning (Tr. 298-299); that Plaintiff functioned well in isolated settings, as influenced by his diagnosis of PTSD, and that social situations tended to adversely impact his functioning effectively. (Tr. 299). The Court is aware that Dr. Castillo also checked off a box indicating that Plaintiff's ability to understand, remember and carry out simple job instructions was seriously limited. Her narrative explanation, however, confined this limitation to complex job duties. (Tr. 298-299).

At his administrative hearing on July 13, 1999, Plaintiff testified that he performed a variety of household chores[10], had limited social contacts[11], and that he was able to drive but no longer qualified for a commercial driver's license because of his seizure disorder. (Tr. 41-46, 55-56). He stated that the most significant problems impacting his ability to work were memory impairment, the threat of recurrent seizures and difficulty getting along with people. He felt that he would become confrontational if he had to deal with people. (Tr. 47-48, 50-51).

---

[9] A rating of fair on the medical assessment form indicates that claimant's "[a]bility to function in this area is seriously limited but not precluded." (Tr. 296).

[10] Plaintiff stated that did yard work, swimming pool maintenance, cooking, his own laundry, 80% of all vacuuming, mopping and sweeping, that he repaired small appliances, and did small wood working jobs. Tr. 40-43).

[11] Plaintiff stated that he occasionally went out to dinner with his mother and sister, that he went to a coffee shop daily, and that he had one friend, a disabled veteran, whom he saw on a daily basis. (Tr. 42, 44-45).

The ALJ called a vocational expert ("VE" herein) to testify at the Administrative hearing. She testified that a person with Plaintiff's vocational profile (age, education, prior work experience) further restricted to simple, repetitive work that did not involving dealing directly with the public or extensive contact with supervisors and co-workers, and did not involve working at heights or around moving machinery, could perform several occupations.[12] She further testified that all jobs would be eliminated if the individual had an unsatisfactory ability to deal with supervisors or co-workers, that no jobs involved no contact with supervisors or co-workers, and that all jobs would be eliminated by an unsatisfactory ability to understand, remember, carry out simple instructions or to behave in an emotionally stable manner.   (Tr. 65-66).

### III.   ALJ's Decision

In a decision issued October 21, 1999, the ALJ found that Plaintiff suffered from a severe impairment or combination of impairments consisting of seizure disorder, memory loss, headaches, mood swings and PTSD; that these impairments did not meet or equal a listed impairment; that Plaintiff's testimony did not credibly establish symptoms and functional limitations to the extent alleged; that Plaintiff retained the residual functional capacity ("RFC" herein) for simple, repetitive work at a medium exertional level; that his seizure disorder prevented him from returning to his prior work, and that  based on VE testimony, Plaintiff could perform a significant number of jobs in the national economy, that therefore was not disabled. (Tr. 18-28).

### III.   Issues presented

Plaintiff contends that the ALJ's findings as to his mental and physical RFC were not

---

[12]Semi-conductor assembly, DOT 590.684-002; Bench assembler, DOT 706.684.-022; Hand packager, DOT 920-587-018; Parking lot attendant, DOT 915.473-010; Eyeglass frame polisher, DOT 713.684-038; Photo finisher, DOT 976.487-010, and Janitor, DOT 382.664-010.  (Tr. 61-64).

supported by substantial evidence, and that the ALJ failed to apply correct legal standards in making those findings.

**IV.     Standard of Review**.

The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. *42 U.S.C. §405(g)*. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . " *Id.* I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether correct legal standards were applied. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence is more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable man might accept to support the conclusion. *Gossett v. Bowen,* 862 F.2d 802, 804 (10th Cir. 1988). The determination of whether substantial evidence supports the Commissioner's decision is not a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). I will not reweigh the evidence, but will examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision in order to determine if the decision is supported by substantial evidence. *Glenn*, 21 F.3d at 984.

**IV.  Analysis**

The determination of RFC is an administrative finding of what an individual can still do despite his limitations, and is based on all the relevant evidence, including a claimant's description of his limitations and observations by treating or examining physicians and other persons. See 20 C.F.R. §§ 404.1545(a), 416.945(a) It assesses the extent to which an individual's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [an

individual] can do in a work setting."   Id.

In assessing Plaintiff's physical RFC the ALJ discussed:  Dr. Rudolph's conclusion that Plaintiff could perform sedentary desk or computer work provided his employer knew of the risk of seizures; the opinion of administrative agency physicians that Dr. Rudolph's report documented no exertional limitation, and Plaintiff's numerous daily activities.  (Tr. 19-22).  Dr. Rudolph's report and examination findings indicate that he attributed  Plaintiff's limitations not to exertional factors, but to his seizure disorder.  At the time of Dr. Rudolph's evaluation, three and a half months after Plaintiff's last seizure, it was unknown whether Plaintiff's seizure disorder could be controlled by medication.  The ALJ noted that as of the time of the Administrative hearing, Plaintiff's seizures were considered "well controlled" by Dilantin.  (Tr. 21).

Other than Dr. Rudolph's unsupported conclusion, there is simply no evidence that Plaintiff has any exertional limitation.  Dr. Rudolph's  note contains no medical findings that would indicate Plaintiff has any such limitation,  no treating physician has concluded or even suggested that Plaintiff has any such limitation, and Plaintiff himself attributed all of his limitations to his seizure disorder or anger problems.  (Tr. 110-113, 47-58).

I find that the ALJ applied correct legal standards in evaluating the opinion of Dr. Rudolph, and that substantial evidence supports his finding that Plaintiff retained the RFC for medium work, the exertional level at which he was employed prior to the onset of his seizure disorder.

The ALJ found that Plaintiff had the mental RFC for simple, repetitive tasks.  (Tr. 22).  The hypothetical question he posed to the VE included additional restrictions of working in a non-public work place where he did not deal directly with the public or have extensive contact with supervisors

or co-workers.[13] (Tr. 60, 63).

Dr. Castillo identified additional limitations relevant to Plaintiff's Mental RFC. She indicated that stress, or an increase in stress, seriously limited Plaintiff's ability to behave in an emotionally stable manner or deal with work stresses, and prevented him from relating predictably in social situations. The ALJ ignored these findings[14].

An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.2002) (quotation omitted). If the ALJ rejects the treating physician's opinion, he must state specific, legitimate reasons for doing so. *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir.2001) (quotation omitted).

Although such reasons may exist, the ALJ failed to cite specific reasons for disregarding Dr. Castillo's opinion as to Plaintiff's compromised ability to behave in an emotionally stable manner, deal with work stresses, and relate predictably in social situations. Accordingly, I find that the ALJ failed to apply proper legal principles in his evaluation of the opinion of Dr. Castillo.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand [Docket No. 14] is granted in part, and this matter is hereby remanded to the Commissioner of Social Security for additional proceedings. The Commissioner shall reassess Plaintiff's Mental Residual Functional Capacity. The Commissioner shall give controlling weight to the opinions of Plaintiff's treating

---

[13] By including these additional limitations, the ALJ necessarily credited the opinion of Dr. Castillo, Plaintiff's treating psychologist, over Dr. Balcazar who felt Plaintiff would have no difficulty interacting with supervisors and co-workers, and agency psychologists who stated that Plaintiff's mental impairment was not severe.

[14] Plaintiff contends that the ALJ also took out of context Dr. Castillo's statement that Plaintiff worked well in "isolated settings." From the record before me, it is not clear how the ALJ viewed this statement.

psychologists, if those opinions are well-supported and not inconsistent with other substantial evidence in the record. If the treating psychologist's opinion, or any portion thereof, is rejected, the Commissioner shall state specific, legitimate reasons for doing so. After reevaluation of Plaintiff's mental RFC, the Commissioner shall proceed with the remaining steps of the sequential evaluation process.

                                                                           **Richard L. Puglisi**
                                                    **United States Magistrate Judge**
                                                        **(sitting by designation)**